THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JANG HAN BAE, Defendant-Appellant.

First District (4th Division) No. 1—86—3612

Opinion filed November 23, 1988.

1066

Julius Lucius Echeles, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Assistant State's Attorney, and Marie Quinlivan Czech, Special Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial, the defendant was found guilty of three counts of murder, arson with intent to defraud an insurer, and arson without consent. The defendant was sentenced to 70 years' imprisonment. On appeal, the defendant raises issues concerning the admission of his confession at trial, the restriction on the number of peremptory challenges during *voir dire,* the failure to prove the defendant guilty beyond a reasonable doubt, ineffective assistance of counsel, improper jury instructions, and various other trial errors.

The defendant was part owner of Vicstar Electronics, an electronic equipment business. Vicstar rented the first floor of a two-story building located at 2847 North Milwaukee Avenue in Chicago, Illinois. On February 1, 1985, the building caught on fire. Three firemen died while attempting to put out the fire.

Several hours after the fire, the defendant made a full confession to the police which revealed the following. The defendant and his business partner, Ho Soo Lee, wanted to get out of their electronic equipment business, which was insured for $250,000, because they were afraid it might go into bankruptcy. They planned to set fire to the building and then use the insurance money to pay their creditors.

In mid-January of 1985, the defendant and Lee approached a man named Suk Kim and asked him if he would set fire to their store. They discussed a plan whereby the fire would burn about one-third of the store and do smoke damage to any equipment which was in the store at the time. Suk Kim was paid $3,000. This money was taken from Vicstar's cash sales receipts.

Around noon on January 31, 1985, Kim called the defendant. They agreed to set the fire that night. Around 7:30 p.m. that evening, the defendant sent his two employees home. When Kim arrived be-

tween 8 and 8:30 p.m., the defendant gave him a key to the store and showed him how to set the fire alarm and the burglar alarm. Around 9 p.m., the defendant left the store, drove around in his car for a short time and then went home.

Around midnight, Kim called the defendant. Kim told the defendant that if nothing happened, he should just go to the store in the morning as usual. At 3:40 a.m., the defendant received a call from the company that monitored his alarm system. The caller said that the defendant's alarm had gone off and that he would send someone to check on the store. Approximately 30 minutes later, the defendant received another call from the same person, who said that the store across the street caught on fire but that the defendant's store was secure. At approximately 6 a.m., the defendant went to Vicstar and found that it was on fire.

Prior to trial, the defendant moved to suppress this confession. The defendant claimed that he asked to speak to a lawyer on several occasions but the police ignored these requests. The trial judge denied this motion. Details of the motion to suppress hearing are provided later in this opinion.

At trial, the State presented evidence to corroborate the defendant's confession. A certified arson investigator testified that the cause of the fire was arson. The investigator testified that the fire started when plastic bottles containing isopropyl alcohol were ignited. A police officer testified that two cases of bottles of isopropyl alcohol were found in Suk Kim's garage. One case was missing six bottles. The markings on the bottles in this case were similar to the markings on the bottles found at the scene of the fire. A police officer also testified that there were quite a few boxes of electronic equipment from Vicstar in Suk Kim's basement and garage.

Evidence regarding telephone records showed that two calls were placed from Kim's home to Vicstar on January 31, 1985, between 11:15 a.m. and noon. At 9:01 p.m. on January 31, 1985, a call was placed from Vicstar to Kim's home. At 10:30 p.m. a call was placed from Vicstar to a phone booth in Lincolnwood. At 11:49 p.m. a call was placed from Kim's home to the defendant's home.

Evidence regarding the defendant's financial status was also presented at trial. At the time of the fire, Vicstar owed $158,376 to the Korean Exchange Bank in Chicago and $58,000 to a distributor of electronic goods. Vicstar also had checks·returned for insufficient funds for over $50,000.

Several witnesses gave testimony regarding the inventory of the store at the time of the fire. A creditor of Vicstar testified that he

was at the store during the last week of January 1985 to see the defendant about a $58,000 debt and noticed that the inventory was "down considerably." A frequent buyer of Vicstar goods testified that on January 31, 1985, she went to the defendant's store and noticed that the showroom inventory was depleted. She also testified that when she inquired about buying 10 VCRs, the defendant seemed very anxious to make the sale that day and offered to sell her the equipment below cost, which is something he had never done before. A fire fighter testified that there was not a lot of stock in the front part of the store on the day of the fire. A detective who investigated the cause of the fire noticed that there were 30 or 40 empty boxes floating in water in the basement of the store. An investigation of the defendant's home after the fire revealed that the family room contained over 30 pieces of electronic equipment from Vicstar and at least 10 pieces of photographic equipment from Vicstar.

The defendant testified and repudiated his confession. In addition to testifying that he asked for a lawyer before making any statements regarding his involvement with the fire, the defendant testified that his clothes were taken from him shortly after he arrived at the Area 5 police station and that he was given only a paper coverall to wear; that he thought he would not be allowed to speak with a lawyer and that he would be physically abused until he confessed because that is how he heard suspects in Korea were treated; and that the defendant made the statements which the police wanted him to make even though they were untrue because he felt he had no choice.

The State cross-examined the defendant about his testimony regarding the confession. The State presented a photo taken at 10:30 p.m. on February 1, 1985, in which the defendant was dressed in a leather jacket and a sweater. During cross-examination, the defendant admitted that parts of his confession were true. The defendant also admitted that he called an attorney when he first arrived at the police station but he told the police he was calling his insurance company. Finally, the defendant stated that he was not physically abused and never complained to anyone that he had been physically abused by the police in any way.

The defendant also testified that he did not want to get out of his business. The defendant testified that Vicstar's sales volume was continually increasing. He moved his business to the location on Milwaukee Avenue in 1983 because business was growing rapidly and more space was needed. He acknowledged that Vicstar was having some cash-flow problems because of trouble collecting accounts receivable. His partner went to Seoul, Korea, at the end of January to get some

money for their business. The defendant gave his partner $3,000 in cash for travel expenses.

The defendant also testified that he lost everything because of the fire. He told the jury that he could not profit from the $250,000 insurance money because his inventory was over $450,000. According to the defendant, even if he was awarded the insurance money, by the terms of his note from the Korean Exchange Bank, the money would have to be paid directly to the bank. The note was personally guaranteed with a $60,000 certificate of deposit, his home and his inventory.

The defendant further testified that the empty boxes in the basement belonged to the items on display. As for the telephone records, the defendant testified that he spoke with Suk Kim at 11 a.m. and 12 noon on January 31, 1985, regarding some repair work which Suk Kim was hired to do. Because Suk Kim did not come to the store as planned that afternoon, the defendant called him from Vicstar at 9 p.m. Suk Kim was not at home at that time so the defendant left a message. Around midnight, Suk Kim returned the defendant's call to explain why he was not at the store in the afternoon.

Hai Young Kim, Suk Kim's sister-in-law, testified that she was baby-sitting at Suk Kim's home on January 31, 1985, when the defendant called to speak with Suk Kim at approximately 9 p.m. Because Suk Kim was not at home, Hai Young Kim took a message. She gave the message to Suk Kim at 11:30 p.m.

On cross-examination, Hai Young Kim testified that she took many calls that evening, but she could only remember the defendant's call. She also stated that the day before she testified, the defendant asked her to "help [him] for this case." She admitted that the first time she told anybody about this phone call was three days before she appeared in court—almost two years after taking the message.

The defendant initially contends that the trial court erred in denying his motion to suppress. In support of this argument, the defendant maintains that in violation of the constitutional safeguards as set forth in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the police continued to interrogate him even after he requested counsel.

The facts show that the defendant was at the scene of the fire at approximately 9 a.m. on February 1, 1985. After a brief conversation with Detective McElrath, the defendant agreed to go to the police station. The defendant was not under arrest at this time. Upon arriving at the police station, McElrath made arrangements for the defendant to take a polygraph exam.

While waiting to take the exam, the defendant called attorney Pe-

ter Pallis, who spoke with both the defendant and McElrath. McElrath testified that the defendant asked and received permission to call his attorney; however, the defendant testified that he asked and received permission to call his insurance company but called his lawyer instead. In any event, McElrath told Pallis that the defendant was at the police station to substantiate his statements concerning his knowledge of the fire. Pallis told the defendant that he could take the polygraph exam. Pallis also told McElrath that it was all right if the defendant took the exam but that he, Pallis, would not be present for it.

After taking the polygraph exam, which lasted approximately two hours, Detective Johnston, in the presence of Detective McElrath, told the defendant that he failed the polygraph exam. Johnston advised the defendant of his *Miranda* rights and placed him under arrest. The officers testified that the defendant did not ask for counsel at any time after the polygraph. The defendant admits that the *Miranda* warnings were given to him but maintains that when he asked to speak with a lawyer he was told that he had already talked to one.

The detectives then took the defendant to another police station. They arrived around 3:15 p.m. After reading the defendant his rights again, the officers asked him questions. The defendant testified that his further request to speak with a lawyer was refused. The detectives testified that the defendant did not ask for an attorney at this time.

The defendant then made an oral confession. The contents of the oral confession were detailed in the statement of facts in the beginning of this opinion. This confession was repeated to Assistant State's Attorney Dennis Dernbach at approximately 6:30 p.m. The defendant testified that he asked Dernbach to speak to a lawyer but this request was ignored. Dernbach testified that the defendant never asked to speak to a lawyer. The defendant's confession was repeated again in front of a court reporter at approximately 7:30 p.m. The defendant testified that he did not request counsel at this time.

Attorney Jay Kim testified at trial that he had been contacted about the defendant and phoned the police station at approximately 10 p.m. but did not find out if defendant had given a statement. He further testified that he arrived at the police station with the defendant's wife around midnight and spoke with the defendant shortly after their arrival.

■ The defendant, in effect, asks this court to assess the credibility of the witnesses at the suppression hearing. However, it is the

trial court's responsibility to determine the credibility of the witnesses and its decision will not be reversed unless it is against the manifest weight of the evidence. *People v. Metoxen* (1983), 121 Ill. App. 3d 472, 477, 459 N.E.2d 975, 979.

The defendant's primary basis for asserting that the trial judge erred in believing the police officers over the defendant is the fact that the same judge in the course of the same evidentiary hearing involving the same police officers suppressed a statement of former co-defendant Suk Kim, who also maintained that his requests for counsel were denied.

We do not agree with this line of reasoning. The circumstances surrounding the defendant's statement differ substantially from the circumstances surrounding Kim's statement, which was given at approximately 9:15 a.m. on February 2, 1985. A review of the record indicates that throughout the night, Kim continually denied any involvement in the arson fire. At some point Kim's street clothes were taken from him and he was transported between police stations in a paper coverall. An interpreter bought in by the police testified that at 10 p.m. Kim pounded the table and demanded to speak to a lawyer. Kim's wife testified that at 11:30 p.m., while in the presence of the police officer, Kim told her to come back with a lawyer. Kim's wife further testified that the police kept her from calling a lawyer and locked her in an interview room for several hours. There was also substantial evidence that several lawyers were trying to contact Kim but the police used subterfuge to prevent these lawyers from getting through to Kim. The trial judge commented that there was a specific turning point in the conduct of the detectives at the time of Suk Kim's arrest.

In the instant case, except for the defendant's own testimony at the suppression hearing, there was no evidence to establish that the defendant requested counsel. Attorney Jay Kim's testimony was somewhat vague and by itself does not establish that the police kept attorneys away from the defendant before he signed his confession. Where the *Miranda* warnings were given, the defendant's confession was made a short time after his arrest, and there was no evidence of coercion or subterfuge, we cannot say that the trial court's conclusion that the defendant did not request counsel is against the manifest weight of the evidence.

In connection with the motion to suppress, the defendant also asserts that his confession was given involuntarily because his will was overborne when his requests for counsel were ignored and when he was told that he failed the polygraph exam.

■ A determination of whether statements were given voluntarily is based on the totality of the circumstances. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606.) The trial court's finding on this question will not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Brownell* (1980), 79 Ill. 2d 508, 521, 404 N.E.2d 181, 188.

■ There was no evidence of physical coercion. The defendant consulted with his lawyer after he had been detained by the police. The defendant agreed to take the polygraph exam. The trial court found that the defendant did not request a lawyer after his arrest. The post-arrest interrogation itself was not unusually long, and the defendant confessed after being with the police for six hours. Even if being told the results of the polygraph exam had an impact on the defendant's state of mind, we cannot say that, based on the totality of the circumstances, the trial court's conclusion that the defendant confessed voluntarily is against the manifest weight of the evidence.

■ The defendant's second contention is that he was not proved guilty beyond a reasonable doubt because his confession was the only evidence linking him to the arson fire and three murders. In order for a conviction based upon a confession to be sustained it must be corroborated. (*People v. Willingham* (1982), 89 Ill. 2d 352, 359, 432 N.E.2d 861, 864.) The corroboration requirement is satisfied by proof of the *corpus delicti*. (*People v. Willingham* (1982), 89 Ill. 2d 352, 359, 432 N.E.2d 861, 864.) If evidence is presented which tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*. *People v. Lambert* (1984), 104 Ill. 2d 375, 379, 472 N.E.2d 427, 429.

■ The cause of the fire as detailed in the defendant's confession was established by a certified arson investigator who testified at trial that the cause of the fire was arson. The link between Suk Kim and the fire was corroborated by evidence of the plastic bottles of isopropyl alcohol which were found at Suk Kim's home. The link between the defendant and Suk Kim was corroborated by the electronic equipment from Vicstar found in Kim's basement and garage as well as by various telephone calls made between the defendant and Suk Kim. There was also evidence presented to corroborate the defendant's financial motive to cause the arson fire. In sum, because there was independent evidence which established that arson was the cause of the fire and there were objective facts which corroborated the material part of the defendant's confession, the defendant's conviction based on his confession is sustained.

The defendant's third contention is that he was denied effective assistance of counsel. In support of this argument, the defendant maintains that defense counsel should have presented documentary evidence such as financial statements and checking and savings account records to corroborate the defendant's testimony that he had no financial motive to cause the arson fire because Vicstar was a growing business and made a profit in 1984; defense counsel should have presented testimonial evidence to corroborate the defendant's testimony that contrary to the State's evidence, Vicstar's inventory was not depleted on January 31, 1985; defense counsel devaluated the testimony of Hai Young Kim by explaining why she suddenly decided to testify; defense counsel failed to allow the defendant to explain the presence of Vicstar's inventory in the defendant's home and in Suk Kim's home; defense counsel did not sufficiently elaborate on the defendant's claim that he could not make money by collecting from his insurance company because his inventory was worth more than the insurance coverage; defense counsel failed to discredit Detective Boris' testimony at trial that he thought the defendant saw counsel "before or after" the signing of the statement when Boris testified at the motion to suppress hearing that he believed the defendant saw counsel before signing the statement; defense counsel failed to move for a discharge of the venire when the trial judge mistakenly referred to the defendant as a "non-American"; defense counsel failed to effectively argue that the defendant's confession was involuntary by not bringing to the jury's attention the circumstances surrounding the polygraph exam that preceded the statements, including that he was told the results could not be used against him and was told that he "flunked the test"; and defense counsel failed to preserve many issues for appeal by not objecting at trial and/or by failing to raise them in his post-trial motion.

A defendant claiming ineffective assistance of counsel must show that counsel's performance was deficient and there is a reasonable probability that but for this deficient performance the result of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Guest* (1986), 115 Ill. 2d 72, 88-89, 503 N.E.2d 255, 262.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of a case on the ground of lack of sufficient prejudice, that course should be followed. *Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70; *People v. Albanese* (1984), 104

Ill. 2d 504, 527, 473 N.E.2d 1246, 1256.

■ We believe that even assuming the trial counsel's performance was deficient, we cannot say that there is a reasonable probability that, but for counsel's alleged unprofessional errors, either singly or in their totality, the result would have been different. Without addressing every instance of alleged incompetence of counsel, it appears that the defendant primarily objects to the failure of defense counsel to present corroborating evidence to support his defense that he had no financial motive to commit an arson. While there is a possibility that the documentary and testimonial evidence might have bolstered the defendant's testimony, it is not enough for the defendant to show that the errors had some effect on the outcome of the trial. (*Strickland,* 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067; *People v. Hicks* (1987), 162 Ill. App. 3d 707, 712, 516 N.E.2d 807, 811.) Furthermore, far from establishing that the defendant lacked a financial motive, the documentary evidence could have raised several questions regarding the defendant's alleged sound financial situation. Therefore, we do not believe that the defendant is entitled to a new trial based on ineffective assistance of counsel.

The defendant's fourth contention is that he was denied his constitutional right to counsel of his choice when the trial judge insisted that counsel remain as defendant's lawyer, over defendant's objections, for purposes of proceedings on post-trial motions and for sentencing and when the court failed to offer the defendant the option of proceeding *pro se.* Having already decided that the defendant was not denied ineffective assistance of counsel at trial, we find no merit to this argument. Furthermore, the defendant on appeal fails to show how he was prejudiced by counsel's continued representation after conviction.

■ The defendant's fifth contention is that the trial court erred in improperly restricting his peremptory challenges to 10. The defendant argues that under section 115—4(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(e)) he was entitled to 20 peremptory challenges because this was a capital case. However, prior to *voir dire* the defendant waived his right to a sentencing jury, and therefore the defendant was no longer entitled to the number of challenges reserved for defendants who are subject to receiving capital punishment from a jury. *People v. Wolfe* (1986), 144 Ill. App. 3d 843, 851, 494 N.E.2d 670, 676.

■ The defendant's sixth contention is that he was prejudiced when, during *voir dire,* the trial court erroneously referred to the defendant as a "non-American." The defendant further contends that

the prejudice created by this reference was exacerbated when a venireperson said that he could not be fair because he had served in the military in Korea.

Defense counsel promptly objected to the misstatement, which the trial judge quickly corrected. This was sufficient to cure any prejudice. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 281, 503 N.E.2d 277, 292.) As for the comment by the venireperson, we cannot say that the defendant was unduly prejudiced. We do not believe that because of this isolated incident the jurors were unable to reach a verdict based solely on the evidence. See *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 475 N.E.2d 840.

The defendant's seventh contention is that the trial court erred when it allowed the State to amend the indictment prior to selecting a jury to reflect that the owner of 2847 North Milwaukee Avenue was Sabhi Chehade rather than Victor Montanez.

■■■ An indictment may be amended on motion of the State's Attorney or the defendant at any time because of formal defects. (Ill. Rev. Stat. 1985, ch. 38, par. 111—5.) Where no hint of surprise or prejudice is shown, the allowance of an amendment is not error. *People v. Jones* (1973), 53 Ill. 2d 460, 465, 292 N.E.2d 361, 363; *People v. Simon* (1981), 101 Ill. App. 3d 89, 93, 427 N.E.2d 843, 847.

■■■ Even if this change in the identity of the owner of the building is not a formal defect, the defendant fails to allege any surprise or prejudice because of this amendment. Nor did the amendment change the very offense with which the defendant was charged. (*People v. Simon* (1981), 101 Ill. App. 3d 89, 94, 427 N.E.2d 843, 847.) Accordingly, we hold that the trial court acted properly in allowing the amendment to reflect the proper owner of 2847 North Milwaukee Avenue.

The defendant's eighth contention is that his conviction for arson with intent to defraud an insurer should be reversed because the indictment charged him with intent to defraud General Accident Insurance Company and at trial it was established that the defendant was insured by Potomac Insurance Company of Illinois. The defendant maintains that proof involving intent to defraud Potomac Insurance Company does not establish the charge as stated in the indictment.

■■■ We find no merit to the defendant's argument. An insurance agent testified at trial that Potomac Insurance Company of Illinois is part of General Accident Insurance Company. While we agree with the defendant that intent to defraud a named insurer is an essential element of the offense, the defendant fails to cite any cases to establish that the testimony at trial regarding the connection between Gen-

eral Accident Insurance Company and Potomac Insurance Company of Illinois materially varies the allegation in the indictment and the proof at trial in such a way as to require reversal.

The defendant's ninth contention is that he is entitled to a new trial because the jury was improperly instructed. The defendant's primary argument in support of this contention is that the submission of general verdict forms ("guilty of murder" and "not guilty of murder") for the murder counts was prejudicial error. The defendant maintains that because he was charged under different theories of murder, he was entitled to separate verdict forms for each of the theories.

 We disagree. It is not error to submit general verdict forms for murder even though a defendant is prosecuted under more than one theory of murder. (*People v. Wilson* (1978), 61 Ill. App. 3d 1029, 378 N.E.2d 378.) The defendant fails to cite any authority to the contrary.

Regarding the jury instructions, the defendant also argues that the trial court erred in refusing to give certain tendered jury instructions on intent, knowledge, and specific intent with respect to arson with intent to defraud. The defendant fails to show how he was prejudiced by the refusal of these requested instructions and based on our review we find no merit to any of these arguments.

 The defendant's tenth contention is that the trial court erred in instructing the jury prior to closing arguments. Because the defendant failed to object at trial or include the objection in the posttrial motion, the issue is waived. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358, 418 N.E.2d 739, 743.) Further, on appeal the defendant cites no cases which support his contention that instructing the jury prior to closing argument instead of after closing argument, pursuant to section 115—4(i) (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(i)), results in reversible error.

 The defendant's eleventh contention is that the cumulative effect of improper prosecutorial closing argument combined with the giving of instructions before closing argument deprived him of a fair trial. The complained-of errors in closing argument can be separated into three categories. In the first category are remarks made by the prosecutor which characterized the defendant as a "joker," as a "liar," as "greedy, dishonorable, calculating and cruel," as "evil," and as a "master accountant" or "master accounter." These comments were not objected to at trial or raised in a motion for a new trial and therefore the defendant has waived the right to raise them on appeal. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 176, 514 N.E.2d 970, 976.)

However, even if these comments had been properly preserved for appeal, prosecutors are allowed wide latitude in closing arguments, and we believe that these remarks are within the range of permissible argument. *People v. Cisewski* (1987), 118 Ill. 2d 163, 176, 514 N.E.2d 970, 976.

■ The second category of alleged improper remarks includes remarks made by the State's Attorney to which the defense attorney's objections at trial were sustained. In this category, the defendant complains of the State's Attorney's comment regarding a defense witness: "[B]ut you know what disturbs me even more, ladies and gentlemen, was the witness that he called yesterday to talk into coming into Court and helping him out. *** I can't tell you how disgusted I was to see him call." Any error in the statement was immediately cured when defense counsel objected and the court sustained the objection, struck the comment and admonished the jurors to disregard the comment. (*People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200, 1205-06.) The defendant also complains about a minor misstatement of evidence regarding the testimony of Hai Young Kim. The misstatement of the testimony was immediately objected to and sustained. This cured any prejudice. *Baptist,* 76 Ill. 2d at 30, 389 N.E.2d at 1206.

■ The third category of alleged improper remarks concerns references made to the families of the deceased and injured fire fighters and to the horrors of the fire. The prosecutor stated that the fire fighters were "burnt beyond recognition." The defendant failed to object to this comment. In closing rebuttal argument, the prosecutor made three brief references to a surviving fireman and the families of the fire victims. The defendant immediately objected to each of these references and each objection was promptly sustained. We recognize that arguments regarding the families of the victims are improper as they have no bearing on the guilt or innocence of the accused. (*People v. Neal* (1985), 111 Ill. 2d 180, 197, 489 N.E.2d 845, 851.) However, we do not believe that they resulted in reversible error where the trial judge immediately sustained the defendant's objection and the references were brief in that they were contained solely to that portion of closing argument in a trial that lasted several days. Looking at the argument of the State in its entirety, we do not believe that these brief remarks constitute an argument of emotional appeal in which the prosecutor dwelled on the victims of the fire such that the entire proceeding was tainted.

■ In conclusion, we cannot say that the complained-of prosecutorial remarks, either individually or cumulatively, combined with the

giving of the jury instructions before closing argument, resulted in reversible error.

The defendant's final contention is that the trial court erred in sentencing him to consecutive terms of imprisonment. The defendant was given a sentence of two concurrent 40-year terms on each of the two counts of murder, a consecutive 30-year term on a third count of murder, and a concurrent seven-year term for arson.

This issue has already been decided. In *People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 518 N.E.2d 1047, the supreme court, on a petition for a writ of *mandamus* filed by the State in this case, held that if the defendant's conviction was affirmed on appeal, a writ of *mandamus* would issue directing the State to vacate the sentence imposed and to impose the sentence of natural life imprisonment mandated by section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)).

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.